# In the United States Court of Federal Claims

## OFFICE OF SPECIAL MASTERS
No. 13-280V
Filed: April 4, 2014
For Publication

*************************************

| | | |
|---|---|---|
| DAVID D. GRIFFIN, | * | |
| | * | |
| Petitioner, | * | Dismissal decision; motion for summary |
| | * | judgment; flu vaccine; GBS; federal |
| v. | * | government contractor; not a federal |
| | * | employee |
| SECRETARY OF HEALTH | * | |
| AND HUMAN SERVICES, | * | |
| | * | |
| Respondent. | * | |
| | * | |

*************************************

Lisa A. Roquemore, Irvine, CA, for petitioner.
Lara A. Englund, Washington, DC, for respondent.


**MILLMAN, Special Master**


## DECISION[1]


On April 23, 2013, petitioner filed a petition for compensation under the National Childhood Vaccine Injury Act of 1986 ("Vaccine Act" or "Act"), 42 U.S.C. §§ 300aa-10–34 (2006), alleging that he suffered Guillain-Barré Syndrome ("GBS") caused by his February 1, 2012, receipt of flu vaccine. Petitioner received the flu vaccine while in Afghanistan employed as a federal government contract worker.

---

[1] Because this decision contains a reasoned explanation for the special master's action in this case, the special master intends to post this decision on the United States Court of Federal Claims's website, in accordance with the E-Government Act of 2002 § 205, Pub. L. No. 107-347, 116 Stat. 2899, 2913 (codified as amended at 44 U.S.C. § 3501 (2006)). Vaccine Rule 18(b) states that all decisions of the special masters will be made available to the public unless they contain trade secrets or commercial or financial information that is privileged and confidential, or medical or similar information whose disclosure would constitute a clearly unwarranted invasion of privacy. When such a decision is filed, petitioner has 14 days to identify and move to redact such information prior to the document's disclosure. If the special master, upon review, agrees that the identified material fits within the banned categories listed above, the special master shall redact such material from public access.

On July 2, 2013, respondent filed a motion for summary judgment, arguing that petitioner is not entitled to compensation under the Vaccine Act because he was not "serving abroad . . . as an employee of the United States" when he received the flu vaccine.  The motion has now been fully briefed and is ripe for decision.

In this case, petitioner does not qualify for compensation under section 300aa-11(c) of the Vaccine Act.  Based on the statutory language, legislative history, and purpose of the Vaccine Act, it is clear that Congress intended to compensate only a certain class of persons who suffer a vaccine injury after receiving a vaccine overseas. Congress provides protection to members of the Armed Forces, federal employees, and individuals who return to the United States within six months of their vaccination.  Petitioner did not return to the United States within six months of his vaccination.  Nor is petitioner a member of the Armed Forces.  Finally, under a traditional agency analysis, petitioner cannot be considered an employee of the United States government.  Under the principles of sovereign immunity, the undersigned may not expand on the waiver of immunity stated in the statute.  Petitioner does not fall within any of the categories listed in § 300aa-11(c)(1)(B)(i)(II) or (III) and is thus not eligible to bring a petition in the Vaccine Program.

## I.     Factual History

Petitioner David Griffin is a United States citizen who worked for Fluor in the Fluor Federal Global Project.  He describes himself as a "civilian government employee."  Griffin Decl. ¶ 5, Aug. 26, 2013.  Fluor maintains a sizeable government contract with the Department of Defense ("DOD"), and many of its employees work alongside United States Armed Forces personnel in Afghanistan.  Id.  Fluor provides support services to DOD and other government agencies through the U.S. Army Logistics Civil Augmentation Program.  Ex. 10, at 1, 2.  These services include food services, latrines, waste management, facilities and construction management, morale, and recreation, among others.  Ex. 11, at 16.  Petitioner asserts that the salary and hiring criteria for a person in his position were set by the military.  Griffin Decl. ¶ 8, Dec. 18, 2013.

The 80-page contract between HQ Army Sustainment Command and Fluor includes various provisions regarding their relationship.  See Ex. 11.  The contract states that "the awardee [Fluor] will operate as an independent contractor and not as an agent of the U.S. Government or U.S. Army."  Ex. 11, at 3.  It requires Fluor to ensure that all "deployable employees are medically and physically fit."  Id. at 30.  Fluor is responsible for obtaining its employees' passports and visas.  Id. at 31.  Fluor also trains its employees, with the exception that the government will train contractor personnel on interacting with detainees, and Fluor is responsible for ensuring that certain employees receive this training.  Id. at 34; Id. at 56–57.  The contract allows the government to direct Fluor to "remove" any contractor personnel who "jeopardize or interfere with mission accomplishment or who fail to comply with or violate" the contract.  Id. at 75.  The contract specifies that "[c]ontractor personnel are prohibited from wearing military clothing unless specifically authorized," and even then, contract personnel must "[w]ear distinctive patches, arm bands, nametags, or headgear, in order to be distinguishable from military personnel."  Id.  It also states:

> All contractor personnel attending meetings, answering Government telephones, corresponding by email and working in other situations where their contractor status is not obvious to third parties are required to identify themselves as such to avoid creating an impression that contracted personnel are Government employees, or official representatives of a Governmental organization.

Id. at 19.

Petitioner was hired by Fluor as a site manager located in Asia/Afghanistan.  Ex. 1, at 10; Ex. 4, at 10; Suppl. Resp. at 8.  Pursuant to the contract between Fluor and DOD, petitioner underwent required medical and security clearances.  Ex. 11, at 5, 30.  In July 2010, he was acknowledged as "fit for duty" in accordance with USCENTCOM policies by Occucare International in Dubai.  Ex. 2, at 1.  Petitioner's security clearance was obtained through CENTCOM Service Component.  Ex. 14, at 8.  Petitioner received emails from the Army regarding his security investigation and was notified by Fluor Industrial Security when he passed his security clearance.  Ex. 19, at 1–2.

On January 31, 2012, petitioner arrived in Afghanistan.  Pet. at 2.  On February 1, 2012, petitioner received influenza vaccine, and his second vaccinations of MMR and varicella.  Med. recs. Ex. 5, at 1–3.  The flu vaccine was a requirement by DOD and was distributed at a Fluor clinic at Bagram Airfield, a United States military base.  Ex. 15, at 8; Ex. 5, at 3.  The immunizations were provided at Fluor's expense.  Ex. 15, at 4.

As a site manager, petitioner worked on a military base in Afghanistan.  Griffin Decl. ¶ 13, Dec. 18, 2013.  He describes his job as akin to a project manager.  Id. at ¶ 12.  He managed "all departments" on the base, which required knowledge about "budgeting, the military's network, supervising, ordering of supplies, communicating, as well as . . . basic knowledge regarding laundry, showers, latrines . . . plumbing, electrical, and cooking."  Id.  Petitioner had daily contact with military officials, including weekly meetings with military commanding officers and the mayor of the base.  Suppl. Resp. at 6.  Petitioner and military officials discussed deadlines, materials, and issues with projects at these daily meetings.  Griffin Decl. ¶ 7, Dec. 18, 2013.  Petitioner also had weekly telephonic conferences with his off-site Fluor supervisor, Cheryl Robertson, in which other site managers were included.  Id. at ¶ 8.  Petitioner's management decisions as site manager were influenced by Army regulations.  Id. at ¶ 12.  Petitioner used equipment and materials that were provided by the military and was required to have military authorization for all requisitions.  Id. at ¶ 9.  The military reviewed petitioner's work performance.  Id.

Petitioner was paid an hourly rate by Fluor.  Ex. 8, at 2–3; Ex. 9, at 1–2.  Federal income taxes were taken from his Fluor paycheck.  Ex. 9, at 1–3.  His health and dental care were provided through Fluor.  Id.; Ex. 20, at 1.  The ultimate authority to terminate petitioner's employment remained with Fluor.  Suppl. Resp. at 8.  Petitioner also accrued leave through Fluor.  Id.

In mid-February 2012, petitioner began to experience weakness and numbness in his extremities.  Med. recs. Ex. 3, at 4.  On March 5, 2012, petitioner's workers' compensation

report was filed with the U.S. Department of Labor.  Ex. 20, at 1.  The Defense Base Act provides workers' compensation protection to civilian employees working outside the United States on U.S. military bases or under contract with the U.S. government for public works or for national defense.  42 U.S.C. §§ 1651–55 (2006).  A private insurance carrier, not the federal government, pays for successful workers' compensation claims under the Defense Base Act.  Division of Longshore and Harbor Workers' Compensation (DLHWC), United States Department of Labor, http://www.dol.gov/owcp/dlhwc/ DBAClaimAdministration.htm (last visited Mar. 26, 2014).  The contractor, not the government, is responsible for ensuring the contractor's employees have Defense Base Act coverage.  Id.  Petitioner lists Fluor as his employer in three different places in his workers' compensation papers.  Ex. 20, at 1, 3, 5.

On March 9, 2012, petitioner visited Makati Medical Center emergency department in Manila, Philippines.  Med. recs. Ex. 3, at 4.  He complained of weakness and numbness in his extremities for the previous 17 days (beginning February 21, 2012).  Id.  On March 12, 2012, Dr. Cynthia B. Anacay noted that petitioner's symptoms were supportive of Guillain-Barré syndrome.  Id. at 7.

## II.    Procedural History

On April 23, 2013, petitioner filed a petition under the Act.  On August 9, 2013, respondent filed a motion for summary judgment, arguing that petitioner is not entitled to compensation under the Vaccine Act because he was not "serving abroad . . . as an employee of the United States" when he received the flu vaccine.  Mot. Summ. J. at 1.  Respondent argues that the Vaccine Act is unambiguous and should be interpreted according to the ordinary usage of "employee," which means one who "works directly for an employer and receives compensation and other benefits directly from the employer in return."  Id. at 4.  (Respondent does not cite a source for this definition.)  Respondent argues that particularly in the context of the federal government, contractors are treated differently from employees, for example, in their eligibility for health insurance plans, pension plans, leave, and other benefits.  Id.  Respondent further argues that the principles of sovereign immunity require the undersigned to construe any ambiguity in favor of immunity.  Id. at 5.

On August 27, 2013, petitioner filed a response to respondent's motion for summary judgment.  Petitioner argues that as a government contract worker stationed in Afghanistan, petitioner was either a member of the Armed Forces or a federal employee.  Opp. Mot. Summ. J. Petitioner argues that the Vaccine Act is ambiguous and should be construed in context with the liberal and inclusive policy behind the statute.  Id. at 8–9.  He argues that construing the statute to exclude petitioner would lead to absurd results.  Id. at 8.  Petitioner cites Rooks v. Secretary of HHS, 35 Fed. Cl. 1 (Fed. Cl. 1996), which rejected a narrow construction of the word "receive" in a case dealing with whether a fetus in utero received a vaccination when his mother received it.  Opp. Mot. Summ. J. at 8–10.  Petitioner also discusses Andrews v. Secretary of HHS, No. 90-3196V, 1996 WL 300644 (Fed. Cl. Spec. Mstr. 1996), in which then-Special Master Abell concluded that an engineer working in conjunction with the United States Department of State, Agency for International Development ("USAID") was a federal employee, using an analysis based on whether the employee acted on "behalf" of the United States and whether the United States exhibited the requisite quantum of "control."  Opp. Mot. Summ. J. at 11–12.  Petitioner

argues that contractors should be considered "de facto federal employees," especially given the increasingly "blended workforce" of civil servants, members of the military, and contractors. Id. at 13. Petitioner goes on to argue that he should be considered either a non-combatant civilian employee of the Armed Forces or a federal employee of the Department of Defense. Id. at 14. Alternatively, petitioner argues that he should not be penalized for failing to return to the United States within six months of his vaccination because he fully intended to return once his employment was over and thus did not "legally leave" the United States. Id. at 16. Petitioner also argues against a strict application of sovereign immunity. Id. at 16–17.

On September 10, 2013, respondent filed a Reply in Support of Respondent's Motion for Summary Judgment. Respondent focuses on language in the contract that "repeatedly disclaims" an employer/employee relationship between the United States government and contractor personnel. Reply at 1–2. Respondent argues that it would not be "absurd, futile or unreasonable" to construe the Vaccine Act to confer different legal rights and remedies upon Americans who work or travel overseas than upon those who remain in the United States Id. at 2. Respondent also argues that petitioner had the alternative of returning to the United States within six months of his vaccination in order to avail himself of eligibility under the Vaccine Program. Id.

On December 19, 2013, petitioner filed a Supplemental Response to Respondent's Motion for Summary Judgment. Petitioner argues that even though he filed a Defense Base Act claim, he will be prejudiced if his petition is dismissed from this Program, as this Program provides recovery for pain and suffering and for full wage loss. Suppl. Resp. at 3. Petitioner concedes that benefits received from his Defense Base Act claim would be offset by any award received in this Program. Id. Petitioner argues that a petitioner can have dual employers and that he was a dual employee of both Fluor and the Department of Defense ("DOD"). Id. at 3, 10. Petitioner discusses and compares this case to Harris v. Attorney General, 657 F. Supp. 2d 1, 12 (D.D.C. 2009), which held that an independent contractor for the Department of Justice was a federal employee for Title VII purposes. Suppl. Resp. at 3–5. In Harris, the D.C. District Court applied common law agency tests, including the test used in Spirides v. Reinhardt, 613 F.2d 826 (D.C. Cir. 1979),[2] to determine whether the Department of Justice retained sufficient control over Harris to qualify as her employer. Harris, 657 F. Supp. 2d 1. The district court eschewed the contract between the parties, as contracts do not necessarily reflect "economic realities" of an employment relationship. Id. at 10. Petitioner argues that he was a federal employee based on the level of control exerted over him by the military, including factors such as who provided the work environment and furnishings and whether his work was integral to the overall mission of the government. Suppl. Resp. at 6–8.

---

[2] Spirides involved a foreign language broadcaster who brought a Title VII complaint against the United States International Communication Agency ("USICA"). 613 F.2d 826. The district court had found that USICA was not the plaintiff's employer and had dismissed her complaint on the grounds that her contract with USICA referred to her as an independent contractor. Id. at 827. The Court of Appeals for the District of Columbia Circuit reversed the district court's grant of summary judgment, holding that the determination of whether a person is an employee or an independent contractor requires an agency analysis considering all of the circumstances of the work relationship, including the "economic realities," and that consideration of the contract alone was insufficient. Id. at 831–33.

On January 21, 2014, respondent filed a Supplemental Reply in Support of Respondent's Motion for Summary Judgment.  Respondent argues that the complex control analysis advocated by petitioner is irrelevant in the context of the Vaccine Program.  Suppl. Reply at 2.  Respondent argues that "because the Vaccine Act was intended to streamline resolution of vaccine claims . . . it is more reasonable to assume that Congress intended courts to use the easy-to-apply, plain meaning of the term 'employee.'"  Id. at 2.

The issue has now been fully briefed and is ripe for a decision.

## ANALYSIS

### A.  Legal Standard for a Motion for Summary Judgment

In order to grant a motion for summary judgment, a special master must find that there is "no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); U.S. Ct. Fed. Cl. R. 56(a); see Vaccine Rule 8(d) (authorizing summary judgment pursuant to Rule 56 of the U.S. Court of Federal Claims).  The moving party bears the burden to show the absence of any genuine issue of material fact.  Jay v. Sec'y of HHS, 998 F.2d 979, 982 (Fed. Cir. 1993).  All of the non-movant's statements are regarded as true, and "all justifiable inferences" must be drawn in favor of the non-moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 253, 255 (1986).  However, a non-moving party must establish "more than the 'mere scintilla of evidence' in support of its position."  Harris, 657 F. Supp. 2d at 7.  "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  Anderson, 477 U.S. at 249–50.

The essential inquiry is "whether the evidence presents a sufficient disagreement of fact to require submission to the factfinder or whether it is 'so one-sided that one party must prevail as a matter of law.'"  Jay, 998 F.2d at 982 (quoting Anderson, 477 U.S. at 251–52).  "Summary judgment is appropriate if the non-movant fails to offer 'evidence on which the [factfinder] could reasonably find for the [non-movant].'"  Harris, 657 F. Supp. 2d at 7 (quoting Anderson, 477 U.S. at 252).  Whether a plaintiff or petitioner is a federal employee is an appropriate question for summary judgment.  See, e.g., Lopez v. Johnson, 333 F.3d 959 (9th Cir. 2003); Harris, 657 F. Supp. 2d 1; Redd v. Summers, 232 F.3d 933 (D.C. Cir. 2000).

### B.  The Vaccine Act's Requirements for Petitioners Who Received a Vaccine Outside of the United States

Among other requirements, in order to receive compensation for a vaccine injury, a petitioner must receive a vaccine under one of three circumstances.  A person who "received the vaccine in the United States or in its trust territories" may be eligible for compensation.  42 U.S.C. § 300aa-11(c)(1)(B)(i)(I) (2006).  Alternatively, even if a petitioner received a vaccine outside of the U.S. or its territories, a person may be eligible for compensation if either:

> at the time of the vaccination such person was a citizen of the United States serving abroad as a member of the Armed Forces or otherwise as an employee of the United States or a dependent of such a citizen, or . . . the vaccine was

manufactured by a vaccine manufacturer located in the United States and such person returned to the United States not later than 6 months after the date of the vaccination.

Id. § 300aa-11(c)(1)(B)(i)(II)–(III).

## C. Standards for Statutory Interpretation

The question of whether petitioner is eligible for compensation under § 300aa-11(c) raises an issue of statutory interpretation, which is an issue of law. Hellebrand v. Sec'y of HHS, 999 F.2d 1565, 1569 (Fed. Cir. 1993) (citing Munn v. Sec'y of HHS, 970 F.2d 863, 870 (Fed. Cir. 1992)). "It is a general rule of statutory construction that where Congress has clearly stated its intent in the language of a statute, a court should not inquire further." Hellebrand, 999 F.2d at 1569 (quoting Brookside Veneers, Ltd. v. United States, 847 F.2d 786, 788 (Fed. Cir. 1988)). If there is some ambiguity in a statute, "a court should seek to avoid construing a statute in a way which yields an absurd result and should try to construe a statute in a way which is consistent with the intent of Congress." Hellebrand, 999 F.2d at 1570–71 (citing Haggar Co. v. Helvering, 308 U.S. 389, 394 (1940) ("All statutes must be construed in light of their purpose. A literal reading of them which would lead to absurd results is to be avoided when they can be given a reasonable application consistent with their words and with the legislative purpose.")).

The United States is sovereign and no one may sue it without the sovereign's waiver of immunity. United States v. Sherwood, 312 U.S. 584, 586 (1941). Respondent argues that the principles of sovereign immunity require this Court to construe any ambiguity contained within the statute in favor of the government. Mot. Summ. J. at 5 (citing Holihan v. Sec'y of HHS, 45 Fed. Cl. 201, 207 (Fed. Cl. 1999); Flannery v. Sec'y of HHS, No. 99-963V, 2003 WL 1699396, at *8 (Fed. Cl. Spec. Mstr. Mar. 14, 2003)). Petitioner counters respondent's argument with more recent cases, which he argues demonstrate a departure from this strict view of sovereign immunity. Opp. Mot. Summ. J. at 16–17.

In Chickasaw Nation v. United States, the Supreme Court directed that "canons are not mandatory rules" but rather "are designed to help judges determine the Legislature's intent as embodied in particular statutory language." 534 U.S. 84, 94 (2001). In Richlin Security Service Co. v. Chertoff, the Court stated, "The sovereign immunity canon is just that—a canon of construction. It is a tool for interpreting the law, and we have never held that it displaces the other traditional tools of statutory construction." 553 U.S. 571, 589 (2008). In Richlin, after considering the legislative history and policy considerations for the statutory term at issue, the Court continued, "There is no need for us to resort to the sovereign immunity canon because there is no ambiguity left for us to construe." Id. at 590. Other special masters have viewed Richlin as a "substantial change" in the sovereign immunity doctrine, allowing for a more "liberal" construction of "remedial" legislation. See Castaneda v. Sec'y of HHS, No. 11-749V, 2012 WL 1722346, at *6 (Fed. Cl. Spec. Mstr. Apr. 24, 2012) (holding that the doctrine of sovereign immunity did not require a narrow construction of the term "receive" and that the petitioner's child "received" a vaccine while in utero); Burch v. Sec'y of HHS, No. 99-946V, 2010 WL 1676767, at *2–*7, *9 (Fed. Cl. Spec. Mstr. Apr. 9, 2010) (providing a thorough discussion of the Supreme Court's sovereign immunity cases through recent years and also

concluding that the petitioner's child "received" a vaccine while in utero).

In limiting its waiver of sovereign immunity, Congress created the requirements in § 300aa-11(c) as conditions precedent to suit. The undersigned's duty is to determine whether petitioner satisfied these conditions precedent, using traditional tools of statutory construction to ascertain the legislative intent. United States v. Am. Trucking Ass'ns, 310 U.S. 534, 542 (1940). The principles of sovereign immunity are one canon of construction. Richlin, 553 U.S. at 589. Other tools of statutory interpretation include an analysis of the legislative history to determine the underlying purpose of the statute. NLRB v. Bell Aerospace Co. Div. of Textron, Inc., 416 U.S. 267, 274–75 (1974).

When Congress passed the National Childhood Vaccine Injury Act of 1986, it intended to establish a "Federal 'no fault' compensation program under which awards can be made to vaccine-injured persons quickly, easily, and with certainty and generosity." H.R. Rep. No. 99-908, at 3 (1986). A need for such legislation arose due to vaccine manufacturers' difficulty in obtaining insurance during the 1980s, resulting in the rising cost of vaccines and decreased availability of vaccine manufacturers. S. Rep. No. 99-483, at 5 (1986). A stated legislative purpose of the Vaccine Act was the federal government's "responsibility to prevent the spread of infectious diseases from other countries into the United States and between States within its own borders." H.R. Rep. No. 99-908, at 5 (1986). Congress attempted to make the Vaccine Injury Compensation Program "fair, simple, and easy to administer" so that vaccine manufacturers would "have a better sense of their potential litigation obligations," and "a more stable childhood vaccine market" would evolve. Id. at 7.

This no-fault compensation program was intended to be simpler and more expeditious and to provide more certain recovery than traditional tort litigation based on negligence. Id. at 6–7. In the 1989 amendments, Congress reiterated its intent that the Program operate informally and expeditiously:

> Congress intended a quick, flexible, and streamlined system . . . . The system was intended to be "fair, simple, and easy to administer" and "to compensate persons with recognized vaccine injuries without requiring the difficult individual determinations of causation and injury."

H.R. Rep. No. 101-386, at 512 (1989). Vaccine proceedings were meant to "be made as swift and uncomplicated as possible." Id. at 515.

"The scope of the Vaccine Act does not extend beyond the borders of the United States. The name itself refers to a 'national' act." McGowan v. Sec'y of HHS, 31 Fed. Cl. 734, 739 (Fed. Cl. 1994) aff'g No. 90-2446V, 1994 WL 879451 (Fed. Cl. Spec. Mstr. May 10, 1994) (holding that a person who received a vaccine outside the United States did not satisfy the Vaccine Act's requirement that she return to the United States by merely visiting the United States). When creating the Vaccine Act, Congress was not concerned with "the continued supply of vaccines outside the United States or the compensation of non-residents of the United States, save for United States Government and military personnel stationed abroad." Id. With respect to § 300aa-11(c), the legislative history states only that "[a] petition must contain a variety of

materials necessary to make a finding that compensation be made," including "evidence that the person on behalf of whom the petition is filed . . . met certain citizenship or location restrictions." H.R. Rep. No. 99-908, at 15 (1986) (cited in McGowan, 31 Fed. Cl. at 739 n.2). It is logical that these citizenship and location restrictions are related to Congress's stated purpose of preventing infectious diseases from reaching the United States. See McGowan, 31 Fed. Cl. at 739. Congress realized that it could not prevent infectious diseases from entering our borders without encouraging Americans who are overseas and are likely to return to the United States to receive vaccinations before returning. Id. Thus, it created three categories of people who could file a petition after receiving a vaccine overseas: (1) American citizens serving overseas as members of the Armed Forces or federal employees, (2) dependents of American citizens serving overseas as members of the Armed Forces or federal employees, and (3) persons who received a vaccine created by an American vaccine manufacturer and who returned to the United States within six months of vaccination. If these categories of persons overseas were not vaccinated, when they returned to the United States, they could potentially spread disease within American borders.

Considering the principles of sovereign immunity as well as the clearly stated legislative purpose that the Vaccine Act be a national program that prevents the spread of infectious disease from other countries within this country's borders, the undersigned will now analyze whether petitioner falls within the exceptions listed in § 300aa-11(c).

1. **Petitioner did not return to the United States within six months of his vaccination, as required by § 300aa-11(c)(1)(B)(i)(III).**

Petitioner did not return to the United States within six months of his vaccination. A person who receives a vaccine made by an American vaccine manufacturer and who returns to the United States within six months of his or her overseas vaccination may bring a petition in the Vaccine Program. 42 U.S.C. § 300aa-11(c)(1)(B)(i)(III). As Judge Nettesheim noted in McGowan, "There is no guidance as to why Congress drew a line at six months, yet Congress did so and the court must honor it." 31 Fed. Cl. at 739 (citing Amendola v. Sec'y of HHS, 989 F. 2d 1180, 1182 (Fed. Cir. 1993) ("When a statute expresses its purpose in short, clear terms, the duty of the court is to apply the statute as written.")).

Additionally, § 300aa-11(c)(1)(B)(i)(III) has been interpreted to require a permanent return, meaning "an injured person must return to the United States within six months of the vaccination date, with the intention to remain permanently from that point on." McGowan, 31 Fed. Cl. at 740, aff'g No. 90-2446V, 1994 WL 879451 (Fed. Cl. Spec. Mstr. May 10, 1994). In McGowan, the undersigned held that a mere physical presence within the United States was not enough to qualify as a "return." 1994 WL 879451 at *4. In that case, the petitioner received a vaccination in Canada, where she resided for two years. Id. at *1. She travelled to the United States several times within six months of her vaccination to visit her grandparents for three to four days at a time. Id. at *3. The undersigned found that a "mere physical presence" without a "resumption of domicile" was insufficient "to constitute a 'return' to the United States." Id. at *4. Judge Nettesheim affirmed on appeal:

> To rule that "return" means simply to physically enter the United States is to invite absurd scenarios. As the transferee special master noted, such a

construction would allow expatriate Americans who have emigrated to other countries or non-citizens who have visited the United States merely to return and spend the day in the United States eligibility to petition and take advantage of the compensation program's ease and funding.  It defies logic that Congress would intend "return" to allow a physical presence without any intent to remain or any duration requirement, especially where the potential of affording compensation to visitors of the United States is present.

McGowan, 31 Fed. Cl. at 739–40 (internal citations omitted).

Petitioner resides in the Philippines and has not returned to the United States since his vaccination.  Petitioner argues that he should be viewed as never having "left" the United States because he never intended to give up his domicile in the United States.  Opp. Mot. Summ. J. at 15–16.  Under petitioner's suggested interpretation, a "return" would require only a subjective intent to return to the United States, without any requirement of physical presence or duration. "[A] court should seek to avoid construing a statute in a way which yields an absurd result and should try to construe a statute in a way which is consistent with the intent of Congress." Hellebrand, 999 F.2d at 1570–71 (quoted in McGowan, 31 Fed. Cl. at 739).  The undersigned rejects petitioner's interpretation of "return" as requiring subjective intent without physical presence.  McGowan stands for the premise that both a physical presence and a subjective intent to remain in the United States are required to meet the Vaccine Act's "return" requirement. Congress unequivocally required a petitioner receiving a vaccination overseas to return to the United States within six months of his vaccination, unless he is a member of the Armed Forces or a federal employee.  It is clear that Mr. Griffin does not qualify as a petitioner under § 300aa-11(c)(1)(B)(i)(III).

### 2.  Petitioner is not a member of the Armed Forces or a federal employee, as required by § 300aa-11(c)(1)(B)(i)(II).

#### a.  Member of the Armed Forces

Petitioner is not a member of the Armed Forces.  The "'Armed Forces' means the Army, Navy, Air Force, Marine Corps, and Coast Guard."  Gonzalez v. Dep't of Army, 718 F.2d 926, 928 (9th Cir. 1983) (quoting 10 U.S.C. § 101(4) (2012)).  Reserve members and National Guard members may also be considered members of the Armed Forces.  See U.S. Armed Forces Overview, Military.com, http://www.military.com/join-armed-forces/us-military-overview.html (last accessed March 25, 2014).  In contrast, petitioner repeatedly refers to himself as a "civilian government employee."  A civilian is generally defined as a person who is not a member of the military or Armed Forces.  See Webster's Ninth New Collegiate Dictionary 244 (1980) (defining a "civilian" as "one not on active duty in a military, police, or fire-fighting force").  While petitioner complied with certain requirements imposed by the Army, such as medical clearances, he did not undergo basic training or any of the other steps that are indicia of being a member of the Armed Forces.  No source that the undersigned has found has identified civilians such as petitioner to be "members of the Armed Forces."  For these reasons, it is unlikely that Congress intended a civilian employee of a defense contractor to be considered a "member of the Armed Forces."

### b.  **Federal Employee**

Petitioner is not a federal employee.  It is unlikely that Congress meant to include private contract employees, each of whom may be under varying levels of control by the federal government, as federal employees.  Even under a common law agency analysis, the federal government did not exert enough control over the manner and means of petitioner's employment to qualify as his employer or joint employer.  An analysis of the contract belies any representation by petitioner that it was his belief that the government was his employer.  Most of the aspects of his employment were controlled by Fluor, not the Department of Defense.

### i.       Meaning of "Employee"

The Vaccine Act does not define "employee."  Various definitions exist throughout case law, statutory law, and dictionary definitions.  Most common dictionary definitions for "employee" focus on receiving payment for one's services.  Webster's Dictionary defines an employee as "one employed by another usu. for wages or salary and in a position below the executive level."  Webster's Ninth New Collegiate Dictionary 408 (1989); see also Random House Dictionary of the English Language 638 (2d ed. 1987) ("a person working for another person or a business firm for pay"); American Heritage Dictionary 450 (2d College ed. 1985) ("a person who works for another in return for financial or other compensation").

The Supreme Court has directed that where Congress does not clearly indicate otherwise, courts should use common law agency principles to determine whether someone is an "employee."  Nationwide Mut. Ins. Co. v. Darden, 503 U.S. 318, 322–23 (1992) (discussing that under both the Copyright Act of 1976 and the Employee Retirement Income Security Act of 1974 ("ERISA"), the common law agency test should be used).  The Court stated that it is a

> "well established" principle that "[w]here Congress uses terms that have accumulated settled  meaning under . . . the common law, a court must infer, unless the statute otherwise dictates, that Congress means to incorporate the established meaning of these terms. . . . In the past, when Congress has used the term 'employee' without defining it, we have concluded Congress intended to describe the conventional master-servant relationship as understood by common-law agency doctrine."

Id. (quoting Cmty. for Creative Non-Violence v. Reid, 490 U.S. 730, 739–40 (1989)).  The Court noted that ERISA's "definition of 'employee' as 'any individual employed by an employer' . . . is completely circular and explains nothing."  Darden, 503 U.S. at 323 (citation omitted).  The Court then summarized its common law agency test:

> "In determining whether a hired party is an employee under the general common law of agency, we consider the hiring party's right to control the manner and means by which the product is accomplished.  Among the other factors relevant to this inquiry are the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between parties; whether the hiring party has the right to assign additional projects to the hired party; the extent

of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party."

Id. (quoting Reid, 490 U.S. at 751–52).  "No one of these factors is determinative."  Reid, 490 U.S. at 752.

The Court also cited the Second Restatement, which lists various factors related to the common law agency analysis:

In determining whether one acting for another is a servant or an independent contractor, the following matters of fact, among others, are considered: (a) the extent of control which, by the agreement, the master may exercise over the details of the work; (b) whether or not the one employed is engaged in a distinct occupation or business; (c) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the employer or by a specialist without supervision; (d) the skill required in the particular occupation; (e) whether the employer or the workman supplies the instrumentalities, tools, and the place of work for the person doing the work; (f) the length of time for which the person is employed; (g) the method of payment, whether by the time or by the job; (h) whether or not the work is a part of the regular business of the employer; (i) whether or not the parties believe they are creating the relation of master and servant; and (j) whether the principal is or is not in business.

Restatement (Second) of Agency § 220(2) (1958) (cited in Darden, 530 U.S. at 324).  The Court stated, "[s]ince the common-law test contains 'no shorthand formula or magic phrase that can be applied to find the answer, . . . all of the incidents of the relationship must be assessed and weighed with no one factor being decisive.'"  Darden, 530 U.S. at 324 (quoting NLRB v. United Ins. Co. of America, 390 U.S. 254, 258 (1968)).

Petitioner relies heavily on the interpretation of employment relationships under Title VII[3], arguing that he had joint employers: while he was undoubtedly an employee of Fluor, he also saw himself as a federal employee controlled substantially by DOD.  See Suppl. Resp. at 10.  Title VII of the Civil Rights Act of 1964 prohibits employers from discriminating based on race, sex, color, religion, and national origin.  42 U.S.C. § 2000e (2006).  The Equal Employment Opportunity Act of 1972 expanded upon Title VII, protecting "employees or applicants for employment" in federal executive agencies and defined units of other branches from discrimination.  86 Stat. 111 § 717 (1972) (codified as 42 U.S.C. § 2000e-16(a) (2006)).

---

[3] Petitioner also cites International Union v. Clark, 2006 WL 2598046 (D.D.C. Sept. 11, 2006),  in which the court used a joint employment test to determine whether the federal government exercised sufficient control over Court Security Officers ("CSOs") for the purposes of the CSOs' suit under the Rehabilitation Act of 1973.

Under Title VII, courts have determined that a person can have dual employers in both the context of private employers and government employers.  See Magnuson v. Peak Technical Serv., Inc., 808 F. Supp. 500 (E.D. Va. 1992) (addressing private employers); see also Harris v. Att'y Gen., 657 F. Supp. 2d 1 (D.D.C. 2009); King v. Dalton, 895 F. Supp. 831 (E.D. Va. 1995); Spirides v. Reinhardt, 613 F.2d 826 (D.C. Cir. 1979) (all addressing public employers).  Courts have used the eleven-factor test articulated in Spirides to determine whether the putative employer possesses the "right to control the 'means and manner' of the worker's performance." Spirides, 613 F.2d at 831.   Other courts have referred to the Spirides test as a "hybrid employment test (which combines the economic realities test and the common law agency test)." Lopez v. Johnson, 333 F.3d 959, 962 (9th Cir. 2003).  Under the Spirides test, the most important factor is the employer's right to control the individual's work, but other relevant factors are considered, including:

> (1) the kind of occupation, with reference to whether the work usually is done under the direction of a supervisor or is done by a specialist without supervision; (2) the skill required in the particular occupation; (3) whether the "employer" or the individual in question furnishes the equipment used and the place of work; (4) the length of time during which the individual has worked; (5) the method of payment, whether by time or by the job; (6) the manner in which the work relationship is terminated; [i].e., by one or both parties, with or without notice and explanation; (7) whether annual leave is afforded; (8) whether the work is an integral part of the business of the "employer"; (9) whether the worker accumulates retirement benefits; (10) whether the "employer" pays social security taxes; and (11) the intention of the parties.

Spirides, 613 F.2d at 832 (quoted in King, 895 F. Supp. at 838).  This test also demands analysis of the "'economic realities' of the work relationship," looking at the totality of the circumstances.  Spirides, 613 F.2d at 831.  Additionally, the Harris court looked at the "parties' understandings of their anticipated roles," as well as whether the individual's tasks were "integral to the [putative employer's] overall mission."   Harris, 657 F. Supp. 2d at 10–11. Petitioner focuses heavily on the two latter factors in his briefs.

Petitioner cites to the only other case addressing this specific issue in this Program, in which then-Special Master Abell analyzed the meaning of "employee" within § 300aa-11(c)(1)(B)(i)(II) of the Vaccine Act.  Andrews v. Sec'y of HHS, No. 90-3196V, 1996 WL 300644 (Fed. Cl. Spec. Mstr. May 22, 1996).  Special Master Abell's decision is not binding on the undersigned.  "It is well-settled that '[s]pecial masters are neither bound by their own decisions nor by cases from the Court of Federal Claims, except, of course, in the same case on remand.'"  Rickett v. Sec'y of HHS, 468 F. App'x 952, 959 (Fed. Cir. 2011) (quoting Hanlon v. Sec'y of HHS, 40 Fed. Cl. 625, 630 (Fed. Cl. 1998), aff'd, 191 F.3d 1344 (Fed. Cir. 1999)). Nevertheless, Andrews is relevant.  In Andrews, Special Master Abell, looking to the surrounding statutory terms and purpose of the Vaccine Act, concluded that "one's status as a federal employee need not be formal."  Id. at *4.  He reasoned that since the Vaccine Act mentions the employment relationship "only in the context of the person's presence outside the United States," the key aspect within the employment relationship is the authority to assign the

13

person to a location outside of the United States. Id. at *5. Special Master Abell held that employees are persons

> who act, formally or informally, in an official capacity on behalf of the United States, or who perform services for the United States similar to those who are otherwise considered employees of the federal government, regardless of the source of salary or wage. Additionally, the United States must be able to exercise that quantum of control relevant to this Act, *viz.*, authority to station personnel extra-territorialy [sic].

Id. He concluded that the petitioner's father was an employee of the United States because, even though his employment contract was with the Near East Foundation rather than with USAID, he served the United States' interest by performing services that the United States was contractually obligated to perform, maintained an office at the United States Embassy, underwent a security clearance, and was subject to USAID leave regulations. Id. at *1, *6–*7. He emphasized the importance of the State Department's issuing a diplomatic passport to petitioner's father, finding it indicated a "close, official relationship with the United States." Id. at *6. He found the diplomatic passport "the most compelling evidence that petitioner's father was a federal employee." Id. He also found that USAID controlled petitioner's father because it determined whether he could take leave out of the country. Id. at *7.

Special Master Abell found it sufficient to qualify under the Vaccine Act as a federal employee if a person acted in an official capacity on behalf of a federal agency or performed personal services similar to the services of a civil officer or federal employee. Id. at *5. He found the key aspect of employment status was the employer's authority to assign the person in question outside United States' territory. Id. The undersigned disagrees with Special Master Abell's analysis of the meaning of "an employee of the United States" within the Vaccine Act. 42 U.S.C. § 300aa-11(c)(1)(B)(i)(II). As mentioned previously, the Supreme Court has directed that, unless Congress has indicated otherwise, common law agency analysis should be used to determine a person's status as an employee, and the factors emphasized by Special Master Abell (whether someone acted in an official capacity or whether an employer had the authority to assign a person overseas) are not emphasized in general agency law. Darden, 503 U.S. at 322–23. Special Master Abell asserted that the reason federal employees need not demonstrate they received a vaccine manufactured in the United States or returned to the United States within six months of their vaccination, as individuals under § 300aa-11(c)(1)(B)(i)(III) must do, "must lie in the federal government's authority to locate individuals extra-territorially in order to accomplish national objectives," but there is no evidence that this was Congress's reasoning. Andrews, 1996 WL 300644, at *5. The legislative history is silent as to the reason Congress gave preferential treatment to members of the military and federal employees overseas in comparison to other Americans overseas. The undersigned also notes the factual differences between Andrews and the instant action. In this case, petitioner did not have a diplomatic passport, and he was required to avoid creating the impression that he was a member of the military or a federal employee. Nor is there any evidence that the military, rather than Fluor, determined where petitioner would be located.

###### ii.        Common Law Agency Analysis

Given the overwhelming legal authority applying traditional agency law when Congress fails to satisfactorily define "employee" within a statute, the undersigned concludes that the traditional agency test is the appropriate test to apply in this circumstance. See Nationwide Mut. Ins. Co. v. Darden, 503 U.S. 318, 323 (1992); New York Life Ins. Co. v. United States, 190 F.3d 1372, 1382 (Fed. Cir. 1999); Bender v. Suburban Hosp., Inc., 159 F.3d 186, 190 (4th Cir. 1998); Frankel v. Bally, Inc., 987 F.2d 86, 90 (2d Cir. 1993). The undersigned will apply the factors given by the Supreme Court and in the Second Restatement of Agency. Since petitioner has focused heavily on the Spirides factors, which are highly similar to those considered under the traditional agency test, the undersigned will also analyze those factors. More simply stated, the question is whether, under the totality of the circumstances, the federal government exhibited the requisite control over the manner and means of petitioner's employment to qualify as his employer.

First, one must analyze the level of control the government exercised over the details, manner and means, and hours of petitioner's work. Reid, 490 U.S. at 751; Restatement (Second) of Agency § 220(2); Spirides, 613 F.2d at 832. This is often the most important factor. Spirides, 613 F.2d at 831. The government exhibited some control over petitioner's employment. Petitioner emphasizes the Army's authority to set hiring qualifications as evidence of its control. For example, employees of Fluor were required to pass DOD health, security, and background clearances. Ex. 11, at 5, 30. The contract also provides that the government retains control in certain areas related to safety of contractor personnel. For example, the State Department has responsibility for evacuating non-essential personnel in an emergency. Id. at 30. The government also retains federal jurisdiction over contractor personnel in the event that they commit a crime while abroad and serving alongside the Armed Forces. Id. at 33. In the undersigned's view, these areas of control reserved by the government are not highly significant in terms of an employer/employee relationship. These areas relate not to the everyday performance of the agent's duties, but rather are understandable and necessary measures related to the safety and security of both the contractor employees and members of the military. Traditional agency analysis has tended to focus on the level of control over the day-to-day physical details of the agent's job.[4]

---

[4] For example, the Restatement defines an agent as "a person employed to perform services in the affairs of another and who with respect to the *physical conduct* in the performance of the services is subject to the other's control or right to control." Restatement (Second) of Agency § 220(1) (emphasis added). Comment E of the Second Restatement elaborates on this point:

> Those rendering service but retaining control over the manner of doing it are not servants. They may be agents, agreeing to use care and skill to accomplish a result and subject to the fiduciary duties of loyalty and obedience to the wishes of the principal; or they may be persons employed to accomplish or to use care to accomplish physical results, without fiduciary obligations, as where a contractor is paid to build a house. An agent who is not subject to control as to the manner in which he performs the acts that constitute the execution of his agency is in a similar relation to the principal as to such conduct as one who agrees only to accomplish mere physical results. For the purpose of determining liability, they are both "independent contractors" . . . .

Furthermore, even though the government required that petitioner pass various clearances, Fluor was the responsible party for ensuring that these criteria were met. The contract provided that Fluor was responsible for ensuring that employees were medically and physically fit and stated that immunizations and pre-deployment medical screenings were to be provided at Fluor's expense. Ex. 11, at 30; Ex. 15, at 4. It also provided that Fluor was responsible for providing another qualified employee if the government determined that a contractor employee did not meet the requisite health or security requirements. Ex. 11, at 31. In fact, it was Fluor, not the Army, who notified petitioner when he passed his security clearance. Ex. 19, at 2.

Fluor was responsible for other important areas related to petitioner's employment as well. The contract provided that Fluor was responsible for obtaining passports, visas, and other required documents for its employees. Ex. 11, at 31. (This differs from a key factor in Andrews, 1996 WL 300644 at *6, where Special Master Abell found it highly significant that the petitioner's father in that case was granted a diplomatic passport.)

Consistent with a traditional agency analysis, petitioner also asserts that his day-to-day activities were controlled by the military. He states that most of his daily contact was with military members and that he had weekly meetings with military commanders, in which they discussed action items, progress on previous action items, deadlines, and materials needed. Griffin Decl. ¶ 7, Dec. 18, 2013. Petitioner also met weekly via telephone with his Fluor supervisor, along with ten other site managers. Id. He asserts that he reported to his Fluor supervisor, but military officers instructed him as to his duties. Id. Petitioner writes in his affidavit, "The government, through their regulations, controlled how my job duties were done and how decisions were made." Id. at ¶ 11. Again, the undersigned does not find these aspects of control to be determinative of an employer/employee relationship. Agency analysis tends to focus on the principal's control of the *physical details* of a servant's actions. See supra note 4. Rather than providing factual details indicative of control, petitioner provides mostly conclusory statements that the government was "calling the shots." Griffin Decl. ¶ 7, Dec. 18, 2013. It is unsurprising that much of petitioner's daily contact was with military members, as the purpose for Fluor being in Afghanistan was to support military operations. In fact, petitioner met weekly with both his Fluor supervisor and with government officials, thus indicating that Fluor had at least an equivalent level of control over the details of his work. Military officers may have been directing petitioner as to the results they wanted him to achieve, but petitioner has not presented facts that the military controlled the "manner of" achieving those results. Spirides, 613 F.2d at 831–32 ("If an employer has the right to control and direct the work of the individual, not only as to the result to be achieved, but also as to the details by which that result is achieved, an employer/employee relationship is likely to exist."); see also supra note 4. Petitioner asserts that he "discussed" his responsibilities with military officials at weekly meetings. Griffin Decl. ¶ 7, Dec. 18, 2013. This suggests that he was not merely taking orders. Moreover, petitioner's description of himself as a skilled worker with knowledge about various construction areas and an understanding of Army regulations suggests that he used these skills to exercise independent judgment in his management decisions.

---

Id.

Another factor to consider is whether petitioner's work was a "part of [the Army's] regular business," Restatement (Second) of Agency § 220(2), or stated another way, whether it was part of the Army's "integral" business. Spirides, 613 F.2d at 832. Related to this analysis is whether petitioner had specific skills that would weigh in favor of his being an independent contractor. Reid, 490 U.S. at 751; Restatement (Second) of Agency § 220(2); Spirides, 613 F.2d at 832; see also Izard v. United States, 946 F.2d 1492, 1494 (10th Cir. 1991) (reciting state law agency tests under which, "[i]f the contract work is specialized *per se*, it is not, as a matter of law, part of the principal's trade, business, or occupation"); Restatement (Second) of Agency § 220(2), Comment H (noting that "work which does not require the services of one highly educated or skilled" is a factor indicating a master/servant relationship).

Fluor provided support services to DOD, including food services, latrines, waste management, facilities and construction management. Ex. 11, at 16. Petitioner was a site manager in Afghanistan. Griffin Decl. ¶ 12, Dec. 18, 2013. He describes his job as akin to a project manager. Id. His job required knowledge about "budgeting, the military's network, supervising, ordering of supplies, communicating, as well as . . . a basic knowledge regarding laundry, showers, latrines . . . plumbing, electrical, and cooking." Id. Petitioner notes that his knowledge and management of all these areas were based upon Army regulations. Id. Petitioner asserts that he "was hired to do a specialized job that was part of the military's mission." Id. at ¶ 10. Focusing on the Harris decision, in which the District Court applied the Spirides factors, petitioner argues that his work was "integral to the overall mission" of the military. Harris, 657 F. Supp. 2d at 11. Petitioner argues that subcontractors like himself are "akin to the 'Draft.'" Griffin Decl. ¶ 10, Dec. 18, 2013. He argues that if the military did not employ subcontractors, soldiers would have to do the jobs that the subcontractors currently carry out. Id.

While it is true that petitioner's job was necessary to the business of the military, petitioner's argument misconstrues the purpose of this factor in an agency analysis. In Harris, the District Court of the District of Columbia found that an independent contractor working as a Personnel Security Specialist at the Executive Office of United States Attorneys ("EOUSA") of the Department of Justice was a federal employee. In that case, one of EOUSA's "stated 'major functions' [was] to '[p]rovide operating personnel and security administrative services." 657 F. Supp. 2d at 11. The stated mission of DOD is to "provide the military forces needed to deter war and to protect the security of our country." About the Department of Defense (DOD), U.S. Department of Defense, www.defense.gov/about/ (last visited March 28, 2014). Unlike the Harris plaintiff who was herself carrying out a core function of the organization, Mr. Griffin provided support services, which though necessary, were secondary to the core mission of the military. Additionally, the fact that he describes himself as doing a specialized job with specific skills weighs in favor of an independent contractor relationship.

Additional factors considered in an agency analysis are the location of the employee's work and whether he provided his own tools and instrumentalities. Reid, 490 U.S. at 751; Restatement (Second) of Agency § 220(2); Spirides, 613 F.2d at 832. In this case, the contract provides that the government furnish the place of performance and the property necessary for Fluor's provision of support services. Ex. 11, at 28. Petitioner argues that the military controlled his work environment and furnishing, since he worked on the military base. Suppl. Resp. at 7. He asserts that the government controlled his office space, equipment, and supplies, including

calculators, pens, and paper.  Griffin Decl. ¶ 13, Dec. 18, 2013.  He states that the government was required to sign off on all requisitions for the equipment or materials necessary to do his job. Id.  This factor does weigh in favor of an employer/employee relationship.  However, as stated above, no single factor in an agency analysis is determinative.  Reid, 490 U.S. at 752.  Moreover, the contract provides that the contractor (Fluor) is to provide the government with a list of all property required to fulfill their contractual obligations, Ex. 11, at 29, meaning that Fluor maintained some level of control over the tools and instrumentalities used during the work.

Another factor to be considered under the Spirides test is the method of termination. Spirides, 613 F.2d at 832.  Petitioner argues that United States Army officials had control over his performance reviews and had the power to have him fired if they were not pleased with his work performance.  Griffin Decl. ¶ 8, Dec. 18, 2013.  However, petitioner gives no details as to how the military influenced his performance reviews.  The contract provides that "government representatives may advise the Contractor of any poor performance *in order to provide the opportunity for improvement* during the evaluation period."  Ex. 11, at 35 (emphasis added). Although the government could direct Fluor to "remove" contract personnel for failure to comply with the contract, Id. at 75, it does not give the government the power to fire petitioner. Rather, petitioner concedes that Fluor had the ultimate authority to terminate his employment. Supp. Resp. at 8.  Thus, the method of termination factor weighs in favor of Fluor being petitioner's employer.

Other relevant factors include the method of payment and an employee's benefit and tax treatment.  Reid, 490 U.S. at 751–52; Restatement (Second) of Agency § 220(2); Spirides, 613 F.2d at 832.  The contract specifies a schedule and criteria for the amount of fees awarded to Fluor.  Ex. 11, at 35–36.  In addition, the contract provides that the government will not reimburse the contractor for any costs deemed unreasonable, and that any base pay or allowance increases in excess of 10% should be approved by the contracting officer.  Ex. 11, at 37.

Petitioner was paid an hourly rate by Fluor.  Ex. 8, at 2–3; Ex. 9, at 1–2.  Federal income taxes were taken from his Fluor paycheck.  Ex. 9, at 1–3.  There is no evidence that he received retirement benefits through the federal government.  He was not eligible for Tricare or other federal government employee health benefit plans.  His health and dental care were provided through Fluor.  Ex. 9, at 1–3; Ex. 20, at 1 (identifying "Chartis" as his health insurance carrier). In fact, the contract explicitly limits the government's responsibility to provide medical care to contractor personnel, authorizing only emergency medical care, the cost of which was to be reimbursed by Fluor.  Ex. 11, at 31.  Petitioner received the flu vaccine at a Fluor medical clinic. Ex. 5, at 3.  When petitioner became ill, his medical treatment was authorized by a physician at Fluor Medical Clinic, not at a medical clinic operated by the Army.  Ex. 20, at 1.  Each of these factors involving payment and employment benefits indicates that he was an employee of Fluor, not an employee of the federal government.

Another factor is the belief or intent of the parties regarding their employment relationship.  Restatement (Second) of Agency § 220(2); Spirides, 613 F.2d at 832.  While petitioner asserts that he felt as if he were a member of the Armed Forces and a federal employee, all objective evidence manifests the parties' clear intent that Fluor be treated as an independent contractor and that Fluor's employees not be treated as federal employees.  The

contract between Fluor and the government states that "the awardee [Fluor] will operate as an independent contractor and not as an agent of the U.S. Government or U.S. Army." Ex. 11, at 3. It specifies that "[c]ontractor personnel are prohibited from wearing military clothing unless specifically authorized," and even then, contractor personnel must "[w]ear distinctive patches, arm bands, nametags, or headgear, in order to be distinguishable from military personnel." Id. at 75.  It also states:

> All contractor personnel attending meetings, answering Government telephones, corresponding by email and working in other situations where their contractor status is not obvious to third parties are required to identify themselves as such to avoid creating an impression that contracted personnel are Government employees, or official representatives of a Governmental organization.

Id. at 19.  The contract required that contractors wear badges, from which an individual could identify them as a contracted employee by a minimum distance of ten feet.  Id.

Based on the contract language and petitioner's treatment while on base, it is apparent that there was a clear distinction between contractor employees and federal employees/members of the Armed Forces.  Additionally, petitioner listed Fluor as his employer in his workers' compensation claim, thus exhibiting that he understood himself to be an employee of Fluor—not a member of the Armed Forces or federal employee. Ex. 20, at 1, 3, 5.

A comparison to other cases reinforces the conclusion that petitioner was the employee of an independent contractor rather than a federal employee.  In International Union v. Clark, a case cited in petitioner's brief, the District Court of the District of Columbia determined that Court Security Officers ("CSOs") were joint employees of both the United States Marshal Services ("USMS") and private contractors.  2006 WL 2598046 (D.D.C. 2006).  In that case, the contractors conducted initial employment screenings, paid the CSOs' salaries, provided their benefits, withheld taxes on their behalf, maintained their time and attendance records, and had the ultimate power to terminate their employment.  Id. at *2.  However, USMS set medical, physical, and weapons proficiency standards; interviewed prospective CSOs; performed background checks; supplied essential equipment; conducted the bulk of the CSOs' training; performed performance reviews based on specific standards; determined the CSOs' daily duties; and retained the power to decide whether the CSOs should be removed from the contract for failure to meet the qualifications USMS set for the job (which invariably led to termination of the CSO's employment by the contractor).  Id. at *6–*8.

In Harris v. Attorney General, the District Court for the District of Columbia found that a Personnel Security Specialist working in the Executive Office for United States Attorneys ("EOUSA") in the Department of Justice was a federal employee.  657 F. Supp. 2d 1 (D.D.C. 2009).  In that case, an independent contractor hired the plaintiff, but EOUSA screened and interviewed her before she was hired.  Id. at 3.  EOUSA supervised contractor employees, set their schedules and duties, and gave them performance evaluations, while the independent contractor supervisor had very little contact with the contractor employees and acted "more as a liaison."  Id. at 11.  EOUSA provided the location and essential equipment for work.  Id. at 12. The court found that the plaintiff's services were "integral to [EOUSA's] business" and that

contractor employees provided the same services and received the same supervision as federal employees at EOUSA.  Id. at 11–12.  Thus, even though the contractor provided the plaintiff's salary, benefits, and vacation time; withheld Social Security taxes on her behalf; and had the ultimate authority to terminate the plaintiff, EOUSA exercised greater control over the plaintiff's employment.  Id. at 11–13.

In contrast, in Redd v. Summers, the Court of Appeals for the District of Columbia Circuit found that a contract employee who worked as a tour guide in the Treasury Department's Bureau of Engraving and Printing was not a federal employee.  232 F.3d 933 (D.C. Cir. 2000).  In that case, the Treasury Department provided the equipment used and place of work.  Id. at 939–40.  The court also determined that the plaintiff's Treasury Department supervisor involved herself in the "means and manner" of the plaintiff's work for "one short period," when the supervisor helped the plaintiff to "improve her tour presentation over the course of five or six meetings."  Id. at 938.  However, the court found that these factors were outweighed by the factors indicating that the contractor was her employer: the Treasury Department did not train plaintiff; the contractor provided the majority of supervision over the "means and manner" of plaintiff's work performance; tours were part of the Treasury Department's public relations, not an integral part of its business; the contractor retained sole authority to terminate the plaintiff, even though the contract allowed the Treasury Department to reject any guide; and the contractor paid the plaintiff's wages, provided her vacation time, and paid Social Security taxes on her behalf.  Id. at 938–40.

A comparison of petitioner's case to that of the CSOs in Clark reveals fewer factors weighing in favor of federal employment.  In contrast to Clark, where USMS was involved in the hiring, training, and background clearances of the CSOs, petitioner has not presented any evidence that the Army trained him or interviewed him during his hiring process, and it was Fluor who oversaw his medical and security clearances, not the Army.  This case can also be distinguished from Harris.  Petitioner's Fluor supervisor certainly acted as more than a nominal supervisor or a liaison with the Army, as shown by her weekly meetings with petitioner.  Unlike in Harris where contractor personnel performed essentially the same services as federal employees, there is no evidence that federal employees or members of the military performed duties similar to petitioner.  The level of control over the manner and means of petitioner's work performance is also less significant than in Clark and Harris, where the government determined the daily duties and tasks of contractor personnel and monitored their time and attendance.  Here, the Army did not significantly control the means and manner of petitioner's work performance— petitioner merely had meetings with Army officials and was influenced by Army regulations, factors that could be present in many independent contractor relationships.  Also, as discussed above, petitioner's duties were not a part of the military's "integral business."  Rather, this case is more like Redd.  As in Redd, even though the contract gave the government power to remove or reject contractor personnel, the independent contractor retained the ultimate authority to terminate its employees.  Just as in Redd, the federal government provided the equipment used and place of work, but the contractor trained petitioner, paid his salary and Social Security taxes, and provided his vacation time.

In sum, petitioner was the employee solely of the independent contractor Fluor, rather than a federal employee or a joint employee of the government and Fluor.  While the government

exhibited some control over petitioner in the form of requiring security and medical clearances, supplying the location and tools for employment, engaging in weekly meetings and daily contact with petitioner, and contributing to petitioner's evaluations, the majority of factors, including those that are the most objective and easy to ascertain, weigh in favor of petitioner being the employee solely of the independent contractor, Fluor.  He was a skilled worker doing specialized support work for the military.  The contract repeatedly refers to the relationship as that between an employer and an independent contractor.  Fluor paid petitioner, provided his health benefits, gave him vacation time, and was considered his employer for tax purposes.  Fluor hired petitioner and retained the authority to terminate him.

There is "no genuine dispute as to any material fact" presented.  Fed. R. Civ. P. 56(a).  Even when interpreting "all justifiable inferences" in favor of petitioner, Jay, 998 F.2d at 982, petitioner has not presented probative evidence to show he was a federal employee or member of the Armed Forces.  Rather, the evidence shows that he was solely the employee of Fluor, an independent contractor.

Contrary to petitioner's assertion that the Vaccine Act's legislative purpose requires a broad interpretation of "employee" to include federal contract employees, the undersigned finds significant legislative history supporting a more narrow approach.  As the Federal Circuit has stated, "We cannot disturb the legislative choices Congress made in adopting this compensation scheme."  Tembenis v. Sec'y of HHS, 733 F.3d 1190, 1199 (Fed. Cir. 2013), rev'g 2012 WL 5395405 (Fed. Cl. Oct. 19, 2012), denying review, 2012 WL 3744722 (Fed. Cl. Spec. Mstr. July 31, 2012), cert. pending, 2014 WL 325699 (U.S. Jan. 24, 2014) (holding that Congress did not choose to permit an award of future lost wages in cases where the petitioner dies prior to compensation judgment).  The undersigned cannot ignore the limits Congress imposed on persons vaccinated overseas, as well as within the United States.  The Vaccine Program is grounded in a limited waiver of sovereign immunity.  For example, petitioners may recover only if they have suffered sequelae due to a vaccine injury for more than six months, died as a result of the vaccination, or suffered inpatient hospitalization and surgical intervention as a result of the vaccination.  42 U.S.C. § 300aa-11(c)(1)(D)(i).  Petitioners' spouses are not eligible to recover damages for loss of consortium.  42 U.S.C. § 300aa-11(b)(1)(A).  Just as Congress imposed these conditions to limit who may sue, Congress placed clear limits on who may sue under the Vaccine Program after receiving a vaccine overseas, and these limits may not be disturbed.  Congress, in creating the Vaccine Program, was concerned about the spread of infectious disease from overseas to this country, and thus in order to encourage persons overseas to receive vaccines, allowed people who were likely to return to the United States to file a petition if they had a vaccine reaction.  Petitioner was not a federal employee or a member of the Armed Forces.  He does not meet the requirements of § 300aa-11(c)(1)(B)(i)(II).  Petitioner did not return to the United States within six months of his vaccination.  He does not meet the requirements of § 300aa-11(c)(1)(B)(i)(III).  For these reasons, petitioner is not a valid petitioner under the Vaccine Act.

**CONCLUSION**

Respondent's motion for summary judgment is **GRANTED.**  Petitioner's claim is **DISMISSED.**

In the absence of a motion for review filed pursuant to RCFC Appendix B, the clerk of the court is directed to enter judgment herewith.[5]

**IT IS SO ORDERED.**

Dated: <u>April 4, 2014</u>                                                        <u>/s/ Laura D. Millman</u>
                                                                                      Laura D. Millman
                                                                                      Special Master

---

[5] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by each party, either separately or jointly, filing a notice renouncing the right to seek review.